IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LELAND D. GIBBS,                          )
                                          )
     Plaintiff,                      )
                                          )
vs.                                       )    CIVIL ACTION NO 04-0410-P-L
                                          )
JO ANNE B. BARNHART,                      )
Commissioner of Social Security,          )
                                          )
     Defendant.                      )

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for Social Security disability insurance benefits and supplemental security income benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  Oral argument was held on February 1, 2005.  Upon consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner be **affirmed.**

I.     <u>Issues on Appeal</u>

Plaintiff's brief lacks clarity regarding the specific allegations of error.  The plaintiff has framed the issues as

     1. Whether the Administrative Law Judge (ALJ) erred by entering findings of fact inconsistent with the record, the District Court's findings and order, and the actions of the U. S. District Court for South Carolina.

     2. Whether the ALJ erred by disregarding the findings of the treating physicians and qualified observing individuals in favor of the reports of one time examiners.

However, after review of the plaintiff's proposed report and recommendation and plaintiff's counsel's statements at oral argument, the undersigned has discerned the issues to be:

1. Whether the ALJ erred by not finding plaintiff's severe mental impairments are disabling.

2. Whether the ALJ erred by not finding that plaintiff's severe physical impairments combined with his severe mental impairments are disabling.

3. Whether the ALJ erred by rejecting the opinion of the treating physician, Dr. Gregory Evans.

4. Whether the ALJ improperly rejected the opinion of Fairlie Schreiber, L.C.S.W., and the non-examining agency consultants.

5. Whether the ALJ improperly rejected the finding of severe mental impairments entered by the U.S. District Court for the Southern District of Alabama.

6. Whether the ALJ improperly ignored the U.S. District Court of South Carolina's dismissal of plaintiff's child support enforcement case.

## II.    <u>Background</u>

Plaintiff was born May 26, 1951 and was fifty-two years old at the time of the most recent administrative hearing on September 16, 2003. (Tr. 133, 485).  Plaintiff graduated from high school and has two years of college education. (Tr. 145, 247, 486).  He has past relevant work as a security guard, cook and correctional officer in a state prison. (Tr. 145, 486-487).  Plaintiff alleges that he became unable to work in October 1996 because of constant back pain, bad circulation and swelling in his legs, bad headaches, bad nerves and depression. (Tr. 133-135, 141).

III.    **Procedural History**

Plaintiff applied for disability insurance benefits and supplemental security income in January 1998. (Tr. 133-135).  The applications were denied initially and on reconsideration. (Tr. 97-99, 105-106).  On April 6, 1999, the first administrative hearing was held and plaintiff and his non-attorney representative were present. (Tr. 26-39).  On August 9, 1999, the ALJ entered a decision wherein he found the plaintiff did not have a severe impairment and was not disabled. (Tr. 87-93).  On July 25, 2000, the Appeals Council vacated the decision and remanded the matter for further administrative proceedings to consider and obtain additional evidence regarding plaintiff's mental impairment. (Tr. 120-122).  The Appeals Council agreed with the ALJ's finding that plaintiff's physical impairments were not severe. (Tr. 121).

The second administrative hearing was held on March 14, 2001 before the same ALJ.  Plaintiff was represented by counsel who presented six witnesses who testified on plaintiff's behalf. (Tr. 40-79). The ALJ entered a decision on May 6, 2001 and again found plaintiff did not have a severe mental or physical impairment. (Tr. 333-338).  On December 12, 2001, the Appeals Council denied plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner of Social Security. (Tr. 6-7).

Plaintiff filed an appeal in the U. S. District Court for the Southern District of Alabama and on July 26, 2002, U. S. Magistrate Judge William E. Cassady entered a report and recommendation wherein he recommended reversal of the Commissioner's decision that plaintiff did not have a severe mental impairment and remand of the case to the Commissioner for further proceedings.  On January 23, 2003, Senior U. S. District Judge Virgil A. Pittman adopted the report and recommendation and

3

entered judgment of remand. (Tr. 344-354).

On April 16, 2003, the Appeals Council remanded the case and on September 16, 2003, a third hearing was held before a different ALJ. (Tr. 482-505). Plaintiff, who was represented by counsel, and a vocational expert were present and testified. (Tr. 482). A witness for plaintiff was present but the parties stipulated to his testimony. (Tr. 498). On November 19, 2003, the ALJ entered a decision wherein he found plaintiff had severe mental impairments but did not have severe physical impairments. (Tr. 466-481, 469, 471-472). The ALJ also found that plaintiff's severe mental impairment did not preclude him from returning to his past relevant work as a security guard and that plaintiff was not disabled. (Tr. 481). On April 24, 2004, the Appeals Council denied plaintiff's request for review and the hearing decision became the final decision of the Commissioner of Social Security. (Tr. 411-413).

IV.   **Findings of the Administrative Law Judge**

The ALJ found plaintiff has the severe mental impairments of a personality disorder and dysthymic disorder but did not find that plaintiff has a severe physical impairment. The ALJ found that plaintiff's severe mental impairments, singly or in combination, did not meet or medically equal a listing in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 476, 480).

The ALJ found plaintiff's allegations regarding his physical exertional and mental functional limitations were not fully credible and that plaintiff could perform semi-skilled, work at all exertional levels on a regular and sustained basis. Based upon this residual functional capacity and the VE's testimony, the ALJ found plaintiff could return to his past relevant work as a security guard and was not

disabled. (Tr. 479-481).

V.    **Plaintiff's Testimony**

At the hearing, plaintiff testified as follows:

Plaintiff has been living with his mother since he lost his job.  He has not worked in almost two years. (Tr. 486-487).  He has tried to find a job but has been repeatedly turned down.  Generally, he fills out an application but is never called. (Tr. 493).  He had an automobile accident in November 2002 because he blacked out while driving.  His blackout was thought to be caused by diabetes but it was now under control. (Tr. 487-488).  He attended therapy sessions for about two years but had stopped because of transportation problems. (Tr. 489).

Plaintiff's right hand has had tremors for the last four years or more.  Sometimes it shakes so badly he must eat with his left hand.  His left hand does not tremor. (Tr. 490-491).  He has back pain every day.  He also has swelling and warmth below his right knee. (Tr. 491).  His headaches have stopped.   He no longer takes medication for his depression. (Tr. 492).  Every other month he sees Dr. Evans for treatment of diabetes. (Tr. 492).

Plaintiff sleeps about five hours at night and will fall asleep when he sits in a chair during the day. (Tr. 494).   He can stand as long as he wants but must bend forward in about thirty minutes because it feels good and relieves the agitation in his back. (Tr. 495).  He had this problem before his back was injured in the accident. (Tr. 496).  Plaintiff walks almost every day but stays within eyesight of his house. (Tr. 497).

5

VI.   **Vocational Expert Testimony**

At the hearing on September 16, 2003, the VE testified as follows:

The VE testified that plaintiff's past work as a security guard was light semi-skilled work, as a corrections officer was medium semi-skilled work and as a cook's assistant was medium unskilled work. (Tr. 499).  The ALJ asked the VE whether the personality disorder and depression if controlled with medication would prevent performance of the security guard job.  The VE answered that it could be performed.  The ALJ asked if the job could be performed if the depression was marked and severe and the VE answered that it could not. (Tr. 500).

Plaintiff's counsel added the elements of a bad knee which causes leg swelling, a bad back, hand tremors, and diabetes.  The VE answered that it would depend on the severity of the limitations and that a medical expert should determine the severity. (Tr. 501).  Plaintiff's counsel then asked the VE whether upon consideration of the letter from the career training center and the treating physician's opinion it was still her opinion that plaintiff could perform his past work as a security guard. (Tr. 502). The VE again replied that without specific physical or mental limitations she could not respond. (Tr. 502).  Plaintiff's counsel asked the VE whether in her opinion plaintiff could perform his past work as a cook, and the VE again responded that she does not give an evaluation based just on the record but instead responds to hypothetical questions which contain specific functional limitations. (Tr. 503).

Plaintiff's counsel then presented a hypothetical question containing the elements of a person who can not follow instructions, would lapse into antisocial behavior, was prone to lean over, was prone to go to sleep, was prone to hostility or intimidation, should not work around other individuals, has a hand tremor which prevents much work, has diabetes, should not be around machinery, has

6

problems standing for any period of time, tends to fall asleep, and loses attention or has very limited

attention span. (Tr. 503-504).  The VE responded that if the "inability to follow instructions and

maintain his concentration as (sic) of a marked nature, no, he would not be able to perform jobs." (Tr.

504).


**VII.    Analysis**

    **A.    Standard of Review.**

    In reviewing claims brought under the Act, this court's role is a limited one.  The court may not

decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.

Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be

affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th

Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Substantial

evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971);  Bloodsworth, 703 F.

2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence

even when a court finds that the preponderance of the evidence is against the decision of the

Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); Bloodsworth, 703 F.2d at

1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking

into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v.

Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Further, it has been held that the Commissioner's "failure

7

to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir.1991).  This court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

**B.      Statement of the Law**

An individual who applies for Social Security disability benefits or supplemental security income must prove their disability.  See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).   The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven their disability.  See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  At the first step, the claimant must prove that he or she has not engaged in substantial gainful activity.  At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain;

(4) the claimant's age, education and work history.  Id., at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity and age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th  Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

### C.   Medical Evidence

On October 10, 1997, plaintiff was initially treated at the Mobile County Health Department. The nurse noted plaintiff's statement that he "wants to be on disability [secondary to] bad nerves or chronic back pain." (Tr. 225).  On examination, Dr. Gregory Evans noted lumbar spine tenderness with fair range of motion and a flat affect with depressed mood. (Tr. 231).  He prescribed an anti-depressant medication and Ultram and Orudis for back pain.  He noted that plaintiff received a routine health maintenance examination.  Dr. Evans diagnosed depression and obesity, and ordered a spinal x-ray to rule out lumbar disc disease.  The x-ray was normal. (Tr. 224-225).

On March 13, 1998, plaintiff was consultatively examined by A. Jeffrey Zieman, M.D..  He found plaintiff's examination was normal but for "1-2+ edema in his legs with some changes consistent with chronic venous insufficiency, there are no cords, and no significant tenderness." (Tr. 195).  Dr. Zieman found plaintiff had no impairment of his ability to sit, stand, walk, lift, carry, handle, hear or

speak but should follow up with care for his depression. (Tr. 196).

On March 24, 1998, John W. Davis, Ph.D., consultatively examined plaintiff.  Dr. Davis received plaintiff's report of his family, medical, social and employment history, and conducted a psychological examination which he felt was a valid examination given under good conditions and with good cooperation. (Tr. 197-201).  He reported that plaintiff was of average intelligence and essentially normal and age appropriate in thought process, behavior, memory, appearance, communication, daily activities, and independent functioning (Tr. 197-199) but for his finding that plaintiff's

> social judgment and insight, as well as his capacity to show veracity in reporting his own situation are all affected by his self-centered precept at this point. He is unable to see other people's positions and has fallen back into an internalized perspective.

(Tr. 200).  Dr. Davis noted that there "was nothing unusual about [plaintiff's] gait, posture, mannerisms or hygiene". (Tr. 197).   He also noted plaintiff "showed a good degree of cooperation", and "reflects a good degree of self-sufficiency in his [activities of daily living] for his age." (Tr. 197, 199).  Dr. Davis noted plaintiff's report that he attends church regularly,

> spends his time watching television, doing puzzle books, and reading.  He does enjoy his church work and enjoys singing in the choir.  He is presently living with his mother. He is taking care of his own hygiene and dressing needs but his mother is doing the laundry, cooking, and shopping.  He recognizes that he has fallen into a dependent state upon her.

(Tr. 198).   Dr. Davis diagnosed depression and noted plaintiff should improve in two years. (Tr. 201).

His recommendations were

> This man would do well to go to the mental health center and get back on medication as recommended, as well as to deal with the psychological issues associated with having given up and attempt to remain employed.  He does have the capacity to understand, carry out, and remember work instructions.  He can get along with supervisors and coworkers.  He is able to manage any benefits that might be forthcoming.

10

(Tr. 201).

On March 26, 1998, Charles H. Crump, M.D., a non-examining agency physician, reviewed plaintiff's medical records and Laurin R. Friday, Disability Examiner, reviewed plaintiff's medical and other records. Dr. Crump made a "primary diagnosis" of depression and determined there was "medical evidence in file but insufficient to establish [a secondary] diagnosis." (Tr. 80). In the "Explanation of Determination" the Social Security Administration reported that the records from the Board of Health, Dr. Davis and Dr. Zieman were used in evaluating the claim and that the "evidence shows you have some restrictions and are not able to perform work that you have done in the past" but "[b]ased on your age, education, and past work experience, you are still able to perform other work." (Tr. 81).

On March 27, 1998, Ellen N. Eno, Ph.D., a non-examining agency psychologist, reviewed the record and found plaintiff's depression would cause slight restrictions in activities of daily living and maintaining social functioning. She also found plaintiff would often have deficiencies of concentration, persistence or pace but would never have episodes of deterioration or decompensation. (Tr. 205, 209). Dr. Eno completed a mental residual functional capacity assessment wherein she found plaintiff was not significantly limited in all areas of basic work activities but for a moderate limitation in the ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods of time; and interact appropriately with the general public. (Tr. 211-212).

On May 5, 1998, plaintiff was initially evaluated at the Mobile Mental Health Center by Fairlie B. Schreiber, LCSW, a psychiatric social worker. Plaintiff reported his history of mental health treatment in South Carolina including hospitalization but that he had not taken medication for two years.

11

(Tr. 217).  He reported moving to Mobile to live with his mother after being fired from his most recent job as a security guard [1] and that he has been unemployed since October 1996.  He reported that his ex-wife is pursuing him for child support. (Tr. 217-218).  He reported his daily activities consist of reading, doing puzzle books, sleeping or watching t.v., making his  bed, washing and mowing the lawn.  He reported he would do more housework but his mother will not allow him because she is set in her ways. (Tr. 217).  Schreiber noted plaintiff's report of a depressed mood and anger and an application for disability.  He also noted plaintiff was "rather negative about trying Vocational Rehab." (Tr. 218).

Also, on May 5, 1998, plaintiff was examined by Dr. Hart, a psychiatrist at the Mental Health Center.  The record is mostly illegible but it appears that plaintiff was diagnosed with an adjustment disorder, dysthymia, and a personality disorder.  Trazodone was prescribed.  The doctor also noted that plaintiff's

> [f]ocus is on getting disability as his "personality problems prevent him from obtaining and maintaining a job."  Patient advised that he is not chronically mentally ill — not severely impaired and needs to consider vocational rehab services.

(Tr. 216).  Dr. Hart recommended that plaintiff engage in group therapy and found that plaintiff "needs to be referred to vocational rehab.  I discussed this in depth.  Patient understands this is a prerequisite to further psychiatric treatment." (Tr. 216). [2]

---

[1] Plaintiff reported that he was fired from his security guard job because he was suspected of sleeping at work but he was actually leaning his head back because of a headache.  Plaintiff also reported that he was allowed to resign from his job as a correctional officer after an incident involving carrying $50.00 at work which was a prohibited amount and that he lost his job as a cook because he did not see the schedule and failed to show up.  (Tr. 218).

[2] Schreiber reports that plaintiff participated in group and individual therapy at the Center.  However, there are no treatment records from 1998 and 1999.

Plaintiff returned to the Board of Health on July 22, 1998. Dr. Evans diagnosed stable diabetes and depression. Plaintiff was advised to follow with psychiatry. The records indicate this was a health maintenance visit for nutritional counseling for the American Diabetic Association diet. (Tr. 221).

On April 11, 1998, plaintiff's medical records were reviewed on reconsideration by William H. Tucker, M.D., a non-examining agency physician, and Carol M. Davis, Disability Examiner., reviewed his medical and other records. (Tr. 82). Plaintiff was diagnosed with an adjustment disorder and dysthymia. (Tr. 82). In the "Explanation of Determination", the Administration reported that records from the Board of Health, Dr. Davis and Dr. Zieman, the Health Department records dated August 10, 1998, the Mobile Mental Health Center records dated July 30, 1998, and information provided by plaintiff and others were used in evaluating the claim. The Administration found as follows

> You state you are disabled because of depression, nerves, bad circulation, bad back and headaches. The evidence shows you have some restrictions and are not able to perform work that you have done in the past. However, based on your age, education, and past work experience, you are still able to perform certain types of work.

(Tr. 81, see also Tr. 105-106 Notice of reconsideration stating that plaintiff's record was reviewed by a physician and a disability examiner).

On August 12, 1998, Patricia T. Hinton, Ph.D., reviewed the record and reached the same conclusions as Dr. Eno. (Tr. 232-233, 244). Dr. Hinton found plaintiff was slightly restricted in activities of daily living and maintaining social functioning, would often have deficiencies of concentration, persistence or pace but would never have episodes of deterioration or decompensation. Dr. Hinton completed a mental residual functional capacity assessment wherein she found plaintiff was not significantly limited in all areas of basic work activities but for a moderate limitation in the ability to

13

understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time and interact appropriately with the general public. (Tr. 244).

On May 7, 1999, plaintiff was consultatively examined by C.E. Smith, M.D., psychiatrist.  Dr. Smith noted plaintiff's report of his medical, familial, social, religious, and employment history and examined plaintiff.  He noted plaintiff was "strikingly odd" and that he had an "occasional tremor of his right hand and []often leaned forward in his chair with a grimace and a grunt in response, he said, to back pain." (Tr. 248).  He noted plaintiff was talkative, circumstantial and somewhat playful which impeded the evaluation.  Dr. Smith noted that plaintiff "showed a jocularity and lack of restraint which were inappropriate, and I had difficulty terminating the interview because of his drive to press his case for disability." (Tr. 248).

Plaintiff reported that his back pain, tremor of his hand, bad nerves, depression and confusion were his chief problems. (Tr. 248).  He reported that he was "tired of not getting jobs I apply for  – I'm tired of fighting – if there's some way you can help me I'll appreciate it." (Tr. 249).  Dr. Smith summarized the interview as follows:

> Mr. Gibbs presented special difficulty in evaluation.  He had worked through his adult life and performed with both fair intelligence and showed no grave thinking disorder and did not appear to have any organicity.   He readily understood and remembered and carried out even complex instruction in this setting and he appeared capable of managing his own finances.  However, it is hard to overstate the peculiarity of his appearance and the inappropriateness of his manner.  He was terrifically circumstantial sometimes tangential, and productions were bizarre enough to raise the question of a thinking disorder.  His old records from Richland Memorial Hospital would be useful and I believe psychological testing would be useful.  Without further input, I defer to his diagnoses at Mobile Mental Health Center: [] Dysthymic Disorder and Personality Disorder.

(Tr. 249).  Dr. Smith completed a mental residual functional capacity assessment wherein he found

14

plaintiff was moderately restricted in activities of daily living and maintaining social functioning, and would never experience deficiencies of concentration, persistence and pace. He gave no opinion on episodes of deterioration and decompensation in work or work-like settings. He found plaintiff had no impairment of the ability to function in a routine work setting. (Tr. 250-251).

On January 27, 2000, Fairlie Schreiber wrote that plaintiff attended group therapy, took Wellbutrin and Trazodone, and was diagnosed with a dysthmic disorder and obsessive compulsive personality disorder. Schreiber also wrote that plaintiff has "problems controlling his anger and is marginally stable." (Tr. 254). Schreiber opined that with plaintiff's medical problems of diabetes, gout, and chronic back pain and "difficulty handling his emotions and dealing with people, [plaintiff] would be unable to maintain employment." (Tr. 254).

On August 9, 2000, Magdy Ragheb, M.D., a psychiatrist at Mobile Mental Health Center interviewed plaintiff. Dr. Ragheb marked that plaintiff was appropriate in appearance and affect, had no impairment of speech, and his mood was euthymic[3] but "dysthymic at times".[4] (Tr. 288). He also noted plaintiff denied any suicidal or homicidal ideations and loved his mother. Although Dr. Ragheb's notes are difficult to read it appears he noted plaintiff stopped taking his medication despite having two refills. Plaintiff was advised to take his medication as directed, warned of the risks of non-compliance,

---

[3] A moderate mood. Stedman's Medical Dictionary, at 627 (27th Ed.2000) (defining "euthymia"and "euthymic")

[4] Dysthymia is defined as a "disorder with a chronic depressed mood; it is a mild form of depression." MedlinePlus Medical Encyclopedia. National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus. Symptoms include a depressed mood for most of the day and feeling depressed more days than not which continued for two years or longer, poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, and feelings of hopelessness. Id.

and advised not to drive, engage in hazardous activity, operate machinery, or participate in any activity which would be affected by decreased alertness.  He was advised to follow with Dr. Evans for a physical evaluation. (Tr. 288).

On August 23, 2000, Dr. Ragheb marked that plaintiff was appropriate in appearance and affect, had no impairment of speech, was marginally stable and his mood was euthymic.  He noted plaintiff denied any suicidal or homicidal ideations and loved his mother. (Tr. 283, 284).  Plaintiff reported back pain and Dr. Ragheb noted plaintiff was asked to "bring all medications for review". (Tr. 283).  He noted plaintiff's report that he was "doing fine [unreadable word], no [side effects]" and "I think meds work." (Tr. 283).  Plaintiff was taking Trazodone and Wellbutrin.  Although most of Dr. Ragheb's notes are illegible, he noted plaintiff's report of depression, two past psychiatric hospitalizations, denial of suicide attempts, history of back pain, no history of seizure, his father's "'split personality'" and plaintiff's application for benefits. (Tr. 284).  He also noted plaintiff's speech was slow and he took time to answer. (Tr. 284).  Dr. Ragheb advised plaintiff of the medication effects and to continue with Dr. Evans. (Tr. 285).

On September 6, 2000, plaintiff was consultatively examined by Gerald E. McCleary, Ph.D. Dr. McCleary noted plaintiff's report of his medical, social, familial and employment history.  He noted plaintiff's report that he lives with his mother, watches t.v., attends church, is independent in activities of daily living, and "his physical health is good." (Tr. 256).  He noted plaintiff was dressed appropriately, had normal speech with logical content, normal eye contact, and clear and coherent thinking.  Dr. McCleary also noted that "[i]f given three wishes [plaintiff] would wish for his disability to be granted, to have his own apartment, and for his hair to grow back." (Tr. 256).

16

Dr. McCleary noted no unusual mannerisms except plaintiff "tended to lean over during the evaluation due to his back, but no other pain related behaviors were exhibited." (Tr. 256). Dr. McCleary administered the Wechsler Adult Intelligence Scale. Plaintiff scored a verbal IQ of 91, a performance IQ of 83 and a full scale IQ of 87 which placed him in the low average range of intellectual functioning. Dr. McCleary noted plaintiff was attentive, alert, oriented, motivated and cooperative and that the test results were valid. He also noted plaintiff's "affect was stable and his mood was euthymic" and that plaintiff reported having a "short temper". (Tr. 256). Dr. McCleary diagnosed a personality disorder. In summary, Dr. McCleary reported that "no depressive symptoms were exhibited or reported during the current evaluation" and that plaintiff "does not have a life long history of mental retardation and will not require help to handle his own financial benefits if they are granted. He is able to understand, carry out and remember verbal directions." (Tr. 257).

Dr. McCleary completed a mental residual functional capacity assessment wherein he found plaintiff was slightly restricted in activities of daily living and maintaining social functioning, would seldom experience deficiencies of concentration, persistence and pace, and would once or twice experience episodes of deterioration and decompensation in work or work-like settings. In regard to plaintiff's ability to function in a routine work setting, Dr. McCleary found plaintiff had only a mild limitation of the ability to respond appropriately to supervision and co-workers, but was otherwise unlimited. (Tr. 258-260).

On October 20, 2000, plaintiff returned to Dr. Ragheb and he marked that plaintiff was stable, with appropriate appearance and affect, unimpaired speech, and euthymic mood. (Tr. 281). He noted plaintiff denied any current suicidal or homicidal ideations and that he loved his mother. (Tr. 281). Dr.

Ragheb noted plaintiff's reluctance to let him speak with his family, especially plaintiff's mother and that he would honor plaintiff's request. Plaintiff's current medications were Wellbutrin, Trazodone, and a diabetic medication. (Tr. 281). Dr. Ragheb also wrote "back pain ? Pt. to bring med. for that." (Tr. 281). He noted plaintiff's report that he was "doing pretty fair, can not complain." (Tr. 281). Dr. Ragheb discussed "alternative different modalities, current meds, benefits vs. side effects [unreadable words] etc., risk of decreased alertness, doing any hazardous activities" and advised plaintiff not to drive or operate machinery. He also advised plaintiff to continue seeing Dr. Evans and to bring all medications, including pain medication, to the next visit. (Tr. 281).

On November 17, 2000, Dr. Ragheb interviewed plaintiff and marked that he was stable, with appropriate appearance and affect, unimpaired speech, and euthymic mood. (Tr. 273). He noted plaintiff denied any current suicidal or homicidal ideations and that he loved his mother. (Tr. 273). His current medications were listed as Wellbutrin and Trazodone but no pain medications were reported. (Tr. 273). Dr. Ragheb's handwriting is difficult to read. However, his first words appear to be "doing fine" (Tr. 273). The record also appears to indicate that plaintiff decreased his Trazodone because he was "sleeping fine now." (Tr. 273). Dr. Ragheb discussed the "importance of compliance, risk of recurrence of symptoms." (Tr. 273). He also advised plaintiff to continue seeing Dr. Evans. (Tr. 273).

On December 21, 2000, Schreiber, plaintiff's social worker, wrote to plaintiff's counsel as follows:

> Mr. Gibbs has made a poor adjustment throughout his life. He has lost jobs related to his personality problems and has no contact with his wife or sons. He lives with his mother. He is quiet, rigid, and has difficulty handling change. He has problems with his temper. He tends to ruminate and obsesses about various worries.

18

Prognosis for change is very poor.  Focus in group therapy is to provide support and to
help him evaluation (sic) situations more realistically.  Medication is given to help with
his depression.

(Tr. 269). [5]

On June 28, 2001, plaintiff returned to Dr. Ragheb at the Mental Health Center.  Dr. Ragheb
marked that plaintiff had appropriate appearance, normal mood, constricted affect, and slow speech.
He noted plaintiff was alert, oriented and enjoyed reading and television.  He also noted plaintiff denied
suicidal or homicidal ideations or visual or auditory hallucinations and loved his mother. (Tr. 315).  Dr.
Ragheb noted plaintiff's report of stopping his mental health medications.  He also noted plaintiff missed
his previous appointment.  He discussed with plaintiff the risks of cessation of medication and noted
plaintiff's response of "'if I need it I will take it'". (Tr. 315).  Plaintiff reported taking only pain
medication and the diabetic medication Glucotrol.  He was asked again to bring all medications to the
next visit for review.  Plaintiff was again advised of the medication effects and advised to see Dr. Evans
for physical examination, testing and laboratory work. (Tr. 315).

On July 27, 2001, plaintiff was evaluated by Laura G. Goulden, Ph.D., at the Mental Health
Center.  She noted plaintiff's report of his social, familial, medical, employment, and mental health
treatment history.  On examination, Dr. Goulden noted plaintiff appeared somewhat disheveled, stood

---

[5]   Schreiber reports that plaintiff has lost his jobs because of his personality disorder.
However, he worked as a correctional officer for seventeen years. (Tr. 145).  Plaintiff reported that he
was allowed to resign from this job after an incident involving carrying $50.00 at work which was a
prohibited amount.  He also reported that he lost his job as a cook because he did not see the schedule
and failed to show up. (Tr. 218).  He also reported that he was fired from his security guard job
because he was suspected of sleeping at work but he was actually leaning his head back because of a
headache. (Tr. 218).

bent over because of his reported back pain, and that his hands had tremors more obvious in the right. She noted his report of episodes of slurred speech and confusion and that he was not taking his medication because it interfered with his ability to drive for his mother.  Dr. Goulden administered the Beck Depression Inventory II and noted that plaintiff's "overall score was not indicative of significant symptoms of depression" though he reported depressive symptoms. (Tr. 298).  She also administered the Minnesota Multiphasic Personality Inventory II, and diagnosed a dysthymic disorder and schizotypal personality traits. (Tr. 298-299).  Dr. Goulden recommended a neurological evaluation for the hand tremor, slurred speech and periodic confusion.  She also recommended medication which would not interfere with plaintiff's ability to drive, continued group therapy, monitoring for suicidal or psychotic symptoms, and a referral to Vocational Rehabilitation Services. (Tr. 299).

On September 20, 2001, Michael R. Dunnagan, Director of the Career Training Center wrote plaintiff's counsel that plaintiff was

> ordered by the Mobile Courts to participate in the Mobile Works Non-Custodial training program if deemed eligible.  Mr. Gibbs information was provided to the Department of Human Resources for eligibility determination and was found not eligible.

(Tr. 327). [6]

On November 10, 2002, plaintiff was hospitalized for injuries received in an automobile accident. (Tr. 390-407).  Plaintiff was diagnosed with a compression fracture of the L1 vertebrae

---

[6]  Plaintiff argues that the Career Training Center's finding of ineligibility for their work training program based on a letter from the DHR supports a finding that he was unemployable and thus, disabled. (Doc. 11).  This argument is without merit.  There is no evidence showing why he was ineligible.  The letter from DHR is not in the record.  Also, plaintiff testified that he did not know why he was found ineligible. (Tr. 493).

(lumbar spine) and an anterior inferior C 2 vertebral body fracture (neck).  On November 14, 2002, he was "discharged home in good condition" with instructions to use a back brace, participate in physical activity as tolerated with the brace, and take pain medication as needed.  He was scheduled to follow with an orthopedic doctor in four to six weeks. (Tr. 390).

On January 9, 2003, plaintiff was treated by Gregory Evans, M.D., at the Mobile County Board of Health. (Tr. 388-389).  Plaintiff was diagnosed with stable non-insulin dependent diabetes mellitus, stable depression, and a compression fracture resulting from the automobile accident. (Tr. 389).  He was advised to follow with a neurosurgeon regarding his compression fracture.  The doctor marked "yes" to the following questions: "Understands Current Medical Conditions/Diagnosis: Understands Treatment Plan: Education provided to patient regarding responsibilities in his/her care." (Tr. 389).  The nurse noted that plaintiff "denies complaints" and his current medications were

Glucotrol,[7] Glucophage,[8] Wellbutrin,[9] Lasix,[10]  Kcl[11] (potassium supplement) and Trazodone.[12] (Tr.

388).  On physical examination, Dr. Evans noted spine tenderness and pedal edema. (Tr. 388).

On April 11, 2003, plaintiff returned to the Board of Health.  Dr. Evans diagnosed obesity,

depression, stable non-insulin dependent diabetes mellitus, and pedal edema, and laboratory tests were

---

[7] "Sulfonylurea antidiabetic agents (also known as sulfonylureas) [Glucotrol XL] are used to treat a certain type of diabetes mellitus (sugar diabetes) called type 2 diabetes. . . .  Sulfonylureas work by causing your pancreas to release more insulin into the blood stream." National Library of Medicine, National Institutes of Health.  http://www.nlm.nih.gov/medlineplus/druginfo

[8] "Metformin [Glucophage or Glucophage XR] is used alone or with other medications, including insulin, to treat type 2 (noninsulin-dependent) diabetes. Metformin helps to control the amount of glucose (sugar) in your blood. It decreases the amount of glucose you absorb from your food and the amount of glucose made by your liver. Metformin also increases your body's response to insulin, a natural substance that controls the amount of glucose in the blood." National Library of Medicine, National Institutes of Health.  http://www.nlm.nih.gov/medlineplus/druginfo

[9] "Bupropion [brand name Wellbutrin or Wellbutrin SR]  is used to relieve mental depression and is used as part of a support program to help you stop smoking." National Library of Medicine, National Institutes of Health.  http://www.nlm.nih.gov/medlineplus/druginfo

[10] Lasix is a brand name for the drug Furosemide, "a 'water pill,' [which] is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It also is used to treat high blood pressure." National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo

[11] "Potassium [Kcl] is essential for the proper functioning of the heart, kidneys, muscles, nerves, and digestive system. Usually the food you eat supplies all of the potassium you need. However, certain diseases (e.g., kidney disease and gastrointestinal disease with vomiting and diarrhea) and drugs, especially diuretics ('water pills'), remove potassium from the body.  Potassium supplements are taken to replace potassium losses and prevent potassium deficiency." National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo

[12] "Trazodone is used to treat depression. Trazodone is in a class of medications called serotonin modulators.  It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo

ordered.  It appears that plaintiff was advised to elevate his legs.  Dr. Evans marked "yes" to the

following questions: "understands current medical condition/diagnosis: Understands current medication

usages: Understands current treatment plan: Understands his or her responsibilities in care." (Tr. 385).

The nurse also reported that plaintiff "denies any problems". (Tr. 386).  On physical examination, the

doctor noted plaintiff had spine tenderness and pedal edema. (Tr. 386).  Plaintiff's current medications

were Glucotrol, Glucophage,  Wellbutrin, Lasix, and Kcl. (Tr. 384).

> On June 20, 2003, Dr. Evans signed a letter which stated as follows:

> Mr. Gibbs is currently a patient here at the Mobile County Health department the
> attending (sic)  physician is Gregory Evans.  The patient has been diagnosed and
> treated for the following: Obesity, Depression, Non-Insulin Dependent Diabetes
> Mellitus, Compression Fx (located in the spinal areas), and Pedal Edema.  Medical
> data reveals that the patient is physically and mentally challenged.  Based on the findings
> relating to this patient's ability to engage in the work environment it is a minute
> possibility.

(Tr. 425).


### D.    Plaintiff's Argument

**1. Whether the ALJ erred by not finding plaintiff's severe mental impairments are disabling.**

Plaintiff argues that the ALJ erred by finding that his severe mental impairments did not preclude

him from performing his past relevant work as a security guard and that the ALJ should have found him

to be disabled because of his severe mental impairments.

In his decision, the ALJ stated that the U.S. District Court on appeal of the prior unfavorable

ALJ decision of May 6, 2001, found that plaintiff's mental impairments were severe and remanded the

claim for further administrative proceedings.  The ALJ stated that in accordance with the remand, he

must analyze the medical evidence to determine the degree of mental functional limitation resulting from

plaintiff's severe mental impairments. (Tr. 472, 347-354).  The ALJ then discussed the reports of the

social worker, psychiatrists and psychologists who examined or treated plaintiff, and determined that

plaintiff has the severe mental impairments of dysthymic disorder and personality disorder but

> these impairments, considered both singly and in combination, do not rise to the level of
> severity necessary to either meet or equal the presumptively disabling medical criteria
> set forth in any particular section listed in Part A [20 U.S.C. Pt. 404, Subpt P., App.
> 1.]

(Tr. 476).  The ALJ then found that plaintiff's impairments resulted in a residual functional capacity for

work at all levels of exertion "with only 'mild' limitations in his abilities to maintain activities of daily

living, maintain social functioning, and maintain concentration, persistence, or pace".  (Tr. 476, 477-

478).  The ALJ then found that this "mild degree of impairment in these areas would not significantly

interfere with or prevent [plaintiff's] performance of semi-skilled work activities." (Tr. 476, 479).  The

ALJ then found plaintiff could return to his past relevant work as a security guard. (Tr. 479, 481).

The ALJ assigned "determinative evidentiary weight" to the findings of the psychiatrist, Dr.

Smith, and the psychologists, Dr. McCleary and Dr. Goulden, all of whom examined plaintiff.[13]  The

---

[13] In May 1999, Dr. Smith deferred to the diagnosis of the Mental Health Center: dysthymic
disorder and personality disorder. (Tr. 249).  He completed a mental residual functional capacity
assessment wherein he found plaintiff was moderately restricted in activities of daily living and
maintaining social functioning, and would never experience deficiencies of concentration, persistence
and pace.  He gave no opinion on episodes of deterioration and decompensation in work or work-like
settings.  He found plaintiff had no impairment of the ability to function in a routine work setting. (Tr.
250-251).  On September 16, 2000, Dr. McCleary found no depressive symptom, diagnosed a
personality disorder and found plaintiff "able to understand, carry out and remember verbal directions."
(Tr. 257).  He completed a mental residual functional capacity assessment wherein he found plaintiff

ALJ found that their opinions were "substantially consistent with one another and with the preponderance of the credible evidence contained in the record." (Tr. 476).  The ALJ also stated that he considered the opinions of the non-examining agency psychologists.  He noted that their opinions could not be given controlling weight but must be weighed and considered as experts. (Tr. 477).

The ALJ also weighed the evidence from the Mental Health Center in reaching his decision. The ALJ stated that at the June 2001 visit the psychiatrist [Dr. Ragheb] found plaintiff's condition was stable without significant symptomatology. (Tr. 476).  He also stated that plaintiff's symptoms have remained relatively stable without crisis situations and pointed out the opinion of Dr. Hart, the intake psychiatrist who examined plaintiff in May 1998, who found plaintiff was "'<u>not</u> chronically, mentally ill'" and "'<u>not</u> severely impaired.'" (Tr. 476) (underlining in original).

The residual functional capacity assessment is a measure of what the plaintiff can do despite his limitations. 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945.  The rulings define residual functional capacity as

> what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations

---

was slightly restricted in activities of daily living and maintaining social functioning, would seldom experience deficiencies of concentration, persistence and pace, and would once or twice experience episodes of deterioration and decompensation in work or work-like settings.  He found plaintiff had only a mild limitation of the ability to respond appropriately to supervision and co-workers, but was otherwise unlimited in ability to function in a routine work setting. (Tr. 258-260).  On July 27, 2001, Dr. Goulden, administered the Beck Depression Inventory II and noted that plaintiff's "overall score was not indicative of significant symptoms of depression" though he reported depressive symptoms. (Tr. 298).  She also administered the Minnesota Multiphasic Personality Inventory II, and diagnosed a dysthymic disorder and schizotypal personality traits. (Tr. 298-299).  Dr. Goulden recommended continued mental health treatment and a referral to Vocational Rehabilitation Services. (Tr. 299).

or restrictions that may affect his or her capacity to do work- related physical and mental activities.

Social Security Ruling 96-8p: <u>Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL 374184 at *2.   Because a residual functional capacity determination is an "administrative assessment", it is the function of the ALJ to determine the plaintiff's residual functional capacity through examination of the evidence and resolution of conflicts in the evidence.   <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1079 (11th Cir. 1996); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946.  The ALJ must base the assessment upon all of the relevant evidence of the plaintiff's remaining ability to work in spite off his impairments. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1546; 20 C.F.R. § 404.1527; 20 C.F.R. § 416.946; 20 C.F.R. § 416.927.

The undersigned finds that the ALJ properly determined plaintiff's mental residual functional capacity and that his decision is based upon application of the correct law and supported by substantial evidence in the record.   The ALJ set forth specific examples of evidence in the record to support his ratings.  In regard to his finding that plaintiff has mild restriction in activities of daily living, the ALJ noted plaintiff attended to his own personal needs, did household chores, shopped, and drove a car and that Dr. McCleary found plaintiff only slightly restricted in this area. (Tr. 258).   The ALJ also noted plaintiff's indication that he would expand his daily activities but felt constrained because he lives with his mother. (Tr. 478).  The records indicate that substantial evidence supports the ALJ's finding. Plaintiff reported to the psychiatrists and psychologists that he reads, watches television, helps with household chores, mows the lawn and walks for exercise. (Tr. 256, 197-199, 217).  In his daily activities questionnaire he reported that he watched television, did puzzles, read each day, made his

26

bed, washed dishes, and that he was independent in personal hygiene and needed no help for shopping. (Tr. 154-155).  Even though the consultative psychologist Dr. Smith found in April 1999, that plaintiff was moderately restricted in activities of daily living, (Tr. 250-251), the consultative psychologist, Dr. McCleary found in September 2000 that plaintiff had only a slight restriction of activities of daily living, (Tr. 258), and previously, in March 1998, the consultative psychologist, Dr. Davis noted that plaintiff "reflects a good degree of self-sufficiency in his [activities of daily living] for his age." (Tr. 199).

        In finding that plaintiff has a mild restriction in the ability to maintain social functioning, the ALJ relied upon plaintiff's report that he was active in his church and attended on a regular basis. (Tr. 478). The records indicate that substantial evidence supports the ALJ's finding.  Plaintiff consistently reports that he attends church regularly and enjoys going, despite the reports of his inappropriate behavior from his fellow church members.  Plaintiff reports limited contact with his family other than his mother, but that appears due in part to their residing in another state and in part because of his personality disorder. (Tr. 156). [14]

        In regard to the ALJ's finding that plaintiff was mildly limited in his ability to maintain concentration, persistence and pace, the plaintiff reported that he reads, watches television several hours during the day, and drives; all of which require concentration. Also Dr. Smith found plaintiff had no impairment in maintaining concentration (Tr. 249) and Dr. McCleary found plaintiff only slightly impaired in this area. (Tr. 257-259).   Plaintiff has not indicated any deficit of his ability to concentrate

_____

        [14] In the daily activities questionnaire, plaintiff reported that he went to church on Sunday and sometimes to the store with his mother.  He reported that he never visited his family because they are out of state though he talked with his family about once a month.  He also reported that he did not participate in social activities and that he did not get along well with anyone. (Tr. 156).

but for his report to Dr. Goulden in July 2001 that he had episodes of confusion. (Tr. 298). Even with

knowledge of his statement, Dr. Goulden recommended that he receive vocational counseling and see a

neurologist. She did not indicate that he had any mental functional limitation which would preclude him

from working. Additionally, the Mental Health Center treatment records do not document impaired

concentration or focus. (Tr. 271-296; 315-325).

In regard to episodes of decompensation, the ALJ stated that there was "no evidence that the

[plaintiff] has experienced any episodes of deterioration or decompensation due to any loss of cognitive

ability to concentrate or to mentally understand and carry out the task with which he was confronted."

(Tr. 479). The ALJ noted that plaintiff had not sought mental health treatment since June 2001, which

led to the assumption that he that his mental impairments "have not caused any significant episodes of

decompensation." (Tr. 479). He also noted that Dr. McCleary found plaintiff would "only experience

one or two episodes" and based on plaintiff's "ability to function independently" that led to the

assumption that plaintiff has "not experienced any such episodes during the relevant time period." (Tr.

479). The records indicate that substantial evidence supports the ALJ's finding. The Mental Health

Center treatment records do not document any episodes of decompensation or deterioration. (Tr. 271-

296; 315-325). In July 2001, Dr. Goulden recommended monitoring for suicidal or psychotic

symptoms. (Tr. 299).[15] However, there are no further mental health treatment records to indicate that

---

[15] Dr. Goulden's mention of monitoring for suicidal or psychotic ideations is the first in the record. The Mental Health Center therapists and doctors consistently marked that plaintiff did not have or denied suicidal, homicidal or psychotic ideations. Their findings are particularly relevant in that plaintiff was being counseled for anger management toward his mother with whom he lived. (271-296; 315-325).

plaintiff experienced any further symptoms of any kind.  Dr. Smith did not express an opinion regarding episodes of deterioration and decompensation in work or work-like settings.  However, in regard to plaintiff's ability to function in a routine work setting, he found plaintiff had no impairment. (Tr. 250-251).  As the ALJ indicated, Dr. McCleary completed a mental residual functional capacity assessment wherein he found plaintiff would once or twice experience episodes of deterioration and decompensation in work or work-like settings.   However, in regard to plaintiff's ability to function in a routine work setting, Dr. McCleary  found plaintiff had only a mild limitation of the ability to respond appropriately to supervision and co-workers, but was otherwise unlimited. (Tr. 258-260).

Moreover, plaintiff reports that his "bad nerves" prevent him from getting along well with others, that he has an "attitude problem", and "gets mad easily". (Tr. 157).   He reported that he had not worked in over a year and wrote as follows: "security job lost – temper." (Tr. 157).  However, he also reported that he lost his security guard job because his employer thought he was asleep when he was actually leaning his head back because of a headache, lost his job as a cook because he did not see the work schedule and failed to show up for work, and that he was allowed to resign from his job as a correctional officer after an incident involving carrying a prohibited amount of money at work. (Tr. 218).  It does not appear that he lost his jobs because of deterioration or decompensation in work or work-like settings.


**2. Whether the ALJ erred by not finding that plaintiff's severe physical impairments combined with his severe mental impairments are disabling.**

Plaintiff argues that the ALJ erred by failing to find that he has severe physical impairments and

consequently, failed to find that plaintiff's severe mental and physical impairments in combination result in disabling impairments.  In regard to the ALJ's failure to find that plaintiff has severe physical impairments, plaintiff argues that the ALJ ignored the evidence from plaintiff's past medical records and that the ALJ did not properly consider the injury he received in the November 2002 accident.[16] Plaintiff argues that the ALJ erred by failing to find that he has severe physical impairments of chronic back pain, leg swelling (pedal edema), and hand tremor.

In regard to the severity determination at step two of the sequential evaluation process, the ALJ noted that plaintiff "has the burden to demonstrate that he has a medically determinable severe impairment or combination of impairments". (Tr. 469).   The ALJ then ALJ stated that the

> District Court specifically found that the claimant's mental impairments were severe, but the Court did not address the claimant's alleged physical impairments.[] Consequently, the undersigned hereby adopts and incorporates herein the previous medical summary relative to the claimant's alleged physical impairments as described in the prior August 9, 1999 unfavorable [ALJ] decision.  Based on the above, the undersigned [ALJ] finds that the claimant did not possess a severe physical impairment prior to or at the time of the May 6, 2001 prior decision and that only evidence relative to his subsequent alleged physical impairments will be considered in this decision because no new and material evidence bearing on the prior period has been presented.

(Tr. 469-470). [17]   The ALJ also found that there was a "paucity of medical evidence ... relating to the claimant's alleged physical impairments", "lack of recent medical documentation of visits to physicians",

---

[16] Plaintiff also argues that the ALJ improperly rejected the opinion of his treating physician Dr. Evans, who treated him after the accident.  Dr. Evans' opinion is addressed in section three.

[17]  The May 6, 2001 decision was appealed to this Court and subsequently an order and judgment of remand were entered which adopted the Magistrate Judge's report and recommendation. The Magistrate Judge found that there was substantial evidence to support a finding that plaintiff has a severe mental impairment but did not make the same recommendation regarding plaintiff's alleged physical impairments. (Tr. 347-354).

and "wide gaps between treatment visits." (Tr. 471). The ALJ noted plaintiff's allegation of significant

back problems before the accident but found there were

> no objective medical evidence of a prior back condition. The record shows that x-rays
> of the claimant's lumbar spine were performed at the Mobile County Health
> Department in October, 1997, but the results were reportedly normal. [(Tr. 224-225)]
> There is no further indication in the evidentiary record that the claimant sought or
> received treatment for back problems until the automobile accident in 2002.

(Tr. 472).

After consideration of the medical evidence post May 6, 2001, the ALJ noted that an

"impairment is severe within the meaning of the Regulations if it has lasted or can be expected to last for

a continuous period of not less than 12 months and it imposes significant limitations on an individual's

physical or mental abilities to perform basic work activities" (citation omitted) and that "an impairment

or combination of impairments is not 'severe' if it has no more than a minimal impact or effect on the

particular individual's ability to perform basic work functions." (Tr. 472). He then found that the

"evidentiary record in this case simply does not support a finding that the [plaintiff] possessed a

medically severe and continuing physical impairment that lasted for at least 12 continuous months at any

time during the relevant period under consideration." (Tr. 472).

**Back pain**

Plaintiff argues that the ALJ erred because he failed to find his chronic back pain was a severe

impairment. (Tr. 472).[18]  Plaintiff relies upon the opinion of Dr. Evans, his treating physician from the

---

[18] Plaintiff argues that there are references to diagnoses of back pain in his treatment records.
At oral argument he referred to the examination report by Dr. Davis, the consultative psychiatrist.
However, Dr. Davis did not diagnose back pain, but instead noted plaintiff's report of back pain. (Tr.
197-198). Dr. McCleary also noted plaintiff's report of back pain and that he bent forward due to his

Board of Health, to support his argument. (Tr. 425).   Dr. Evans is the only physician who treated

plaintiff for back pain.  The medical records show that he treated plaintiff once in October 1997, one

year after the alleged onset date.  At that time, Dr. Evans noted lumbar spine tenderness with fair range

of motion, (Tr. 231), prescribed Ultram and Orudis and ordered a spinal x-ray to rule out lumbar disc

disease.  The x-ray was normal thus, ruling out lumbar disc disease. (Tr. 224-225).  In July 1998, the

next visit with Dr. Evans, plaintiff did not mention back pain. (Tr. 221) (Plaintiff was advised about

diabetes and following a diabetic diet).  After plaintiff's automobile accident in November 2002,

wherein he had compression fracture of the spine, he returned to Dr. Evans on two occasions.  On

January 9, 2003, plaintiff was seen on follow up and he denied complaints. (Tr. 389).  On April 11,

2003, plaintiff returned and again  "denie[d] any problems". (Tr. 386).  On physical examination, Dr.

Evans noted only spine tenderness. (Tr. 386).  Dr. Evans' records did not indicate that plaintiff was

taking any pain medication. (Tr. 384).

     Plaintiff testified that the pain was more of an agitation and that he can stand as long as he wants

but must bend forward in about thirty minutes because it feels good and relieves the agitation. (Tr. 495).

Plaintiff was not taking pain medication at the time of his hearing (Tr. 380),[19] at the time of his visits with

Dr. Evans after the accident (Tr. 384-389), or in 2000 and 2001 when he was treated at the Mental

Health Center. [20]   The records indicate that the last time plaintiff was prescribed pain medication for his

back, but he did not diagnose back pain. (Tr. 255).

    [19] The list of medications provided on September 2, 2003 indicates that plaintiff was taking two
diabetic medications. (Tr. 380).

    [20]  On several occasions, Dr. Ragheb asked plaintiff to bring in his pain medication. However,
the records do not show that he ever brought in any pain medication for Dr. Ragheb to review.   In

back was in 1997. (Tr. 224-225).  After his accident, neither Dr. Evans nor the emergency room

physicians placed any functional restrictions on plaintiff's back. (Tr. 384-398, 390).[21]  Also in March

1998 the consultative examiner, Dr. Jeffrey Zieman, found plaintiff had no impairment of his ability to

sit, stand, walk, lift, carry or handle. (Tr. 196).

**Hand tremor**

Plaintiff also argues that the ALJ erred by failing to find that his hand tremors were a severe

physical impairment.  He supports this argument by reference to lay witness testimony of his hands

trembling and Dr. Smith's consultative psychiatric report of April 1999,[22] wherein he  noted plaintiff had

an "occasional tremor of his right hand."(Tr. 35, 51, 63, 64, 76, 175, 248)

In regard to this allegation, the ALJ relied upon the absence of documentation in Dr. Evans'

records to find that the tremors were not a severe physical impairment. (Tr. 472).  The records indicate

---

August 2000, plaintiff reported back pain and Dr. Ragheb noted plaintiff was asked to "bring all
medications for review". (Tr. 283).  Plaintiff returned on October 20, 2000, reported that he took pain
medication for back pain and, again, Dr. Ragheb asked plaintiff to bring all medications, including pain
medication, to the next visit. (Tr. 281).  On November 17, 2000, Dr. Ragheb interviewed plaintiff and
his current medications were listed as Wellbutrin and Trazodone but no pain medications were
reported. (Tr. 273).  In June 2001, plaintiff reported taking only pain and diabetic medication but did
not name the pain medication.  Again, he was asked to bring all medications to the next visit for review.
(Tr. 315).  Plaintiff did not return to the Mental Health Center after this visit.

[21] On November 14, 2002, plaintiff was "discharged home in good condition" with instructions
to use a back brace, participate in physical activity as tolerated with the brace, and take pain
medication as needed.  He was scheduled to follow with an orthopedic doctor in four to six weeks. (Tr.
390).  However, there are no treatment records from any orthopedic physician in the record.

[22] Plaintiff argues that Social Security Ruling 96-9p: Titles II and XVI: Determining Capability
to Do Other Work--Implications of a Residual Functional Capacity for less than a Full Range of
Sedentary Work, 1996 WL 374185 supports his argument because the ruling discusses the affect of
loss of fine manipulation.  However, the Ruling applies only to persons who are limited to less than a full
range of sedentary exertional work.

that plaintiff did not report hand tremors when he saw Dr. Evans in 1997, 1998 or 2003, and Dr. Evans does not mention hand tremors in his treatment records or his opinion letter. (Tr. 221, 225, 384-389). At the two visits in 2003, plaintiff "denie[d] complaints" and "denie[d] any problems". (Tr. 388, 386). The only medical references to hand tremors come from Dr. Smith who in 1999, noted an occasional tremor and Dr. Goulden who in July 2001, noted that plaintiff's hands had tremors which were more obvious on the right. (Tr. 298-299). However, neither Dr. Smith nor Dr. Goulden indicated any functional restriction or limitation in the use of plaintiff's hands, although Dr. Goulden recommended a neurological consult.

**Pedal edema**

Plaintiff argues that his pedal edema was not properly considered by the ALJ in reaching his decision that he did not have a severe physical impairment. The ALJ noted plaintiff's testimony that he had "constant swelling of his right leg below the knee." (Tr. 470). The ALJ noted the diagnosis of pedal edema in Dr. Evans' records and stated that "[t]he only treatment recommended for the claimant's pedal edema was leg elevation, although the treatment note does not indicate with what frequency the claimant's leg was to be elevated." (Tr. 471). The ALJ also found that Dr. Evans noted pedal edema on two occasions but did not report that these findings caused any functional limitations. (Tr. 472).

Plaintiff argues that his medical doctors have treated his pedal edema as "chronic with findings of swelling and venous insufficiencies." (Doc. 11, page 37-38). However, although Dr. Evans noted pedal edema he does not mention any diagnosis underlying the swelling. (Doc. 11, page 13; Tr. 382, 387). The only mention of chronic venous insufficiencies comes from the 1998 consultative examination

34

by Dr. Zieman.  He found plaintiff's physical examination was normal but for "1-2+ edema in his legs with some changes consistent with chronic venous insufficiency, there are no cords, and no significant tenderness." (Tr. 195).  Despite this finding, Dr. Zieman found plaintiff had no impairment of his ability to sit, stand, walk, lift, or carry. (Tr. 196).

At step two, plaintiff has the burden of proof to prove that an impairment is severe and more than a mere slight abnormality.  Brady v. Heckler, 724 F.2d 914, 920 (11th Cr. 1984).  Also, the regulations state that "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a); 404.1521(a).  Basic work activities are defined as

> the abilities and aptitudes necessary to do most jobs.  Examples of these include-- (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 416.921(b); 404.1521(b).  The Eleventh Circuit has held that a plaintiff's impairment may be considered "not severe" only if it is a slight abnormality which has such a minimal effect on plaintiff that it is not expected to interfere with the ability to work, regardless of age, education or work experience.  Brady, 724 F.2d at 922.

The undersigned finds that the ALJ did not err by failing to find that plaintiff's back pain, hand tremors and pedal edema, singly or in combination, were not severe impairments and that substantial evidence supports the ALJ's decision as discussed above.  Although plaintiff alleges that these impairments prevent him from working, he has not provided any medical, clinical or other evidence that

these impairments result in significant functional limitation of his ability to perform basic work activities, 20 C.F.R. §§ 404.1520(c);  416.920(c), or that they were more than a slight abnormality.  Bridges v. Bowen, 815 F.2d 622, 625-626 (11ᵗʰ Cir. 1987). Additionally, as the ALJ pointed out plaintiff has not established that any of the alleged physical impairments caused severe functional limitations which would continue for twelve consecutive months. See Barnhart v. Walton, 535 U. S. 212,122 S. Ct. 1265, 1272 (2002) ("For purposes of making that claim, Walton assumes what we have just decided, namely, that the statute's '12 month' duration requirements apply to both the 'impairment' and the 'inability' to work requirements.").

Plaintiff argues that the ALJ erred by failing to consider his physical impairments in combination with his mental impairments.   As discussed *supra,* the ALJ found that plaintiff did not have a medically severe physical impairment, and that because the District Court had found plaintiff's mental impairments were severe, he "must analyze the medical evidence relative to those impairments in order to determine the degree of functional limitation caused by those impairments." (Tr. 472-473).  The ALJ then discussed and analyzed plaintiff's mental impairments and found that singly or in combination, plaintiff's severe mental impairments did not meet or equal a listing. (Tr. 474-476).  The ALJ next found as follows:

> The undersigned [ALJ] must next make a determination concerning the claimant's residual functional capacity, a term which describes the range of work activities the claimant can perform despite his impairments.  After considering all of the evidence of record, the undersigned finds that the claimant possesses the residual functional capacity to perform work activity at all exertional levels with only "mild" limitations in his abilities to maintain activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. The undersigned finds that the claimant's mild degree of impairment in these areas would not significantly interfere with or prevent his performance of semi-skilled work activities.

36

(Tr. 476).   The ALJ also found that "[a]fter carefully considering all of the evidence, including the hearing testimony and the effects of claimant's impairments, the undersigned finds that the claimant is not disabled in that he has been physically and mentally capable of performing his past relevant work as a security guard[.]" (Tr. 480).

The ALJ must consider the combination of plaintiff's impairments in regard to the ability to perform past relevant work or other work. Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990). If a plaintiff alleges several impairments, the ALJ must consider the impairments in combination, and determine whether their combined effect renders the claimant disabled. Hudson v. Heckler, 755 F. 2d 781, 785 (11th Cir. 1985).   The Eleventh Circuit Court of Appeals has found that the ALJ meets this requirement by expressly finding "the claimant not to suffer any impairment or combination of impairments" sufficiently severe to prevent participation in substantial gainful activity.   Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986).

The undersigned finds that the ALJ properly considered the combined effects of plaintiff's impairments.   The ALJ found that the non-severe physical impairments cause no functional exertional limitation and determined that plaintiff has the residual functional capacity to perform work at all exertional levels.   Because no functional exertional limitations were indicated by any physician who examined the plaintiff, as previously discussed, the undersigned finds that the ALJ correctly made this determination.   He also determined that plaintiff's mental functional limitations would restrict him to semi-skilled work, and as previously discussed, substantial evidence supports the ALJ's determination. Thus, the ALJ's decision that plaintiff could perform semiskilled work at all exertional levels is supported by substantial evidence in the record and indicates that the ALJ properly considered the

37

medical, clinical and other evidence of record regarding plaintiff's mental functional limitations and

physical functional limitations in making this determination.


**3. Whether the ALJ erred by rejecting the opinion of the treating physician, Dr.**

**Gregory Evans.**

Plaintiff argues that the ALJ committed reversible error because he did not adopt Dr. Evans'

opinion as expressed in his letter of June 20, 2003, wherein he stated as follows:

> Mr. Gibbs is currently a patient here at the Mobile County Health department the
> attending (sic)  physician is Gregory Evans.  The patient has been diagnosed and
> treated for the following: Obesity, Depression, Non-Insulin Dependent Diabetes
> Mellitus, Compression Fx (located in the spinal areas), and Pedal Edema.  Medical
> data reveals that the patient is physically and mentally challenged.  Based on the findings
> relating to this patient's ability to engage in the work environment it is a minute
> possibility.

(Tr. 425).

The ALJ adopted the prior ALJ's decision of May 6, 2001, that plaintiff did not have a severe

physical impairment because no new and material evidence was in the record to merit changing the

prior decision.  The ALJ noted specifically that the District Court had reversed and remanded the May

6, 2001 decision solely for consideration of plaintiff's mental impairments. (Tr. 469-470).  The ALJ

then considered the testimony and the medical evidence relevant to the time period after May 6, 2001

and concluded that plaintiff did not have a severe physical impairment. (Tr. 470- 472).  In regard to Dr.

Evans' opinion the ALJ found as follows:

> Dr. Evans stated that the claimant had been diagnosed and treated for obesity,
> depression, non-insulin dependent diabetes mellitus, compression fracture in the spine,
> and pedal edema. Dr. Evans further stated that 'medical data' revealed that the

38

> claimant was 'physically and mentally challenged' and that, 'based on the findings
> relating to [the claimant's] ability to engage in the work environment it is a minute
> possibility.'  It appears that Dr. Evans is offering an opinion that the claimant is totally
> disabled.  However, the undersigned cannot assign any significant evidentiary weight to
> Dr. Evans' opinion regarding the claimant's inability to work because the issue of total
> disability is one that is specifically reserved for the Commissioner.

(Tr. 472).  The ALJ then stated that neither Dr. Evans' records nor the hospital records from plaintiff's

automobile accident "contain objective clinical examination findings or objective diagnostic evidence to

support a conclusion that the claimant possesses even minimal limitations in his ability to perform basic

work activities[.]" (Tr. 472).

The ALJ also stated that Dr. Evans did not clarify the medical data upon which he relied to find

that plaintiff was physically and mentally challenged.  The ALJ stated that Dr. Evans saw plaintiff on two

occasions and noted lumbar spine tenderness and pedal edema but did not report that these findings

cause any functional limitations. (Tr. 472).  The ALJ stated that Dr. Evans' records show that plaintiff's

diabetes was stable in response to conservative treatment with oral diabetic medication. (Tr. 472, 221,

385, 398).  The ALJ also stated that Dr. Evans did not document plaintiff's hand tremors and that his

medical records indicate that plaintiff's compression fracture resolved within five months of the injury.

(Tr. 472).

The ALJ also noted that even though plaintiff reports a history of back trouble before the

accident, there was no objective medical evidence in the past medical records to support the allegation.

The ALJ noted plaintiff's 1997 lumbar spine x-ray [Tr. 224] was normal and that there was no other

pre-2002 treatment for back problems. (Tr. 472).  The ALJ then found that plaintiff did not have a

medically severe physical impairment which lasted for a twelve continuous months or more at any time

39

during the relevant time period. (Tr. 472).

Generally, the opinion of a treating physician must be given substantial weight, or credit, unless "good cause" is shown to the contrary. See Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).  However, an ALJ may properly discount the opinion of a treating physician if the opinion is conclusory, inconsistent with their own medical records, or if the evidence supports a contrary finding.  See Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)); Lewis, 125 F.3d at 1440; see also 20 C.F.R. § 404.1527(c)(2)(if medical evidence is internally inconsistent, the Commissioner may weigh all the evidence and make a decision if he can do so on the available evidence); 20 C.F.R. § 404.1527(d)(4) (generally, the more consistent an opinion with the record as a whole, the greater weight it will be given).  If the ALJ discounts the opinion of a treating physician, the ALJ must clearly articulate the reasons.  Marbury v. Sullivan, 957 F. 2d 837, 841 (11th Cir. 1992) (per curiam); Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987).  Also, the reasons must be legally correct and supported by substantial evidence in the record. Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir.1988); Hale, 831 F.2d at 1012.

The undersigned  finds no error with the ALJ's decision to give less than controlling weight to Dr. Evans' opinion and that substantial evidence in Dr. Evans' treatment records supports the ALJ's decision.  As the ALJ pointed out, plaintiff reported chronic back pain in October 1997 when he came to the Board of Health for a general physical.[23]  On examination, Dr. Evans found spinal tenderness and

---

[23]  At that time, the intake person noted that plaintiff "wants to be on disability [secondary to] bad nerves or chronic back pain." (Tr. 225).  Plaintiff alleges that he became unable to work because

fair range of motion and prescribed medication. (Tr. 231).  However, plaintiff's lumbar spine x-ray was interpreted as normal, (Tr. 224), and plaintiff did not return for treatment until after the motor vehicle accident in November 2002. (Tr. 390-407).  On January 9, 2003, Dr. Evans diagnosed stable non-insulin dependent diabetes mellitus, stable depression, and a compression fracture resulting from the accident. (Tr. 389).  The nurse noted that plaintiff "denies  complaints". (Tr. 388).  On physical examination, Dr. Evans found only spinal tenderness and pedal edema. (Tr. 388).  Plaintiff returned on April 11, 2003, and Dr. Evans diagnosed obesity, depression, stable non-insulin dependent diabetes mellitus, and pedal edema and advised plaintiff to elevate his legs.  On physical examination, Dr. Evans found plaintiff had spine tenderness and pedal edema. (Tr. 386).  Plaintiff's current medications were Glucotrol, Glucophage,  Wellbutrin, Lasix, and Kcl. (Tr. 384).  The record does not indicate that plaintiff was taking any pain or other medication for his back; thus, the medical records support the ALJ's determination that plaintiff's fractured resolved in five months. (Tr. 472).  Also, as the ALJ stated, Dr. Evans' records do not document any hand tremors or treatment for tremors. (Tr. 472).

Although not referenced by the ALJ, Dr. Evans' finding that plaintiff is mentally challenged is not supported by his records.  On January 9, 2003, he marked "yes" to the following questions: "Understands Current Medical Conditions/Diagnosis: Understands Treatment Plan: Education provided to patient regarding responsibilities in his/her care." (Tr. 389).  Again, on April 11, 2003, Dr. Evans marked "yes" to the following questions: "understands current medical condition/diagnosis: Understands current medication usages: Understands current treatment plan: Understands his or her responsibilities in

---

of back pain in October 1996, but there are no medical records contemporaneous with that date.

41

care." (Tr. 385).   These findings do not appear consistent with a person who is mentally challenged.

Moreover, Dr. Evans' treating relationship with plaintiff is not the type contemplated by the regulations when defining a treating source.  Dr. Evans evaluated plaintiff on two occasions in 2003 and had previously seen plaintiff in October 1997 and July 1998. (Tr. 221, 225).  See 20 C.F.R. § 404.1527 (d)(2) (2000); 20 C.F.R. § 416.927(d)(2) (2000) ("Generally,  we give more weight to opinions from your treating sources, since these sources are likely to be  the medical professionals most able to provide a detailed, longitudinal picture of your medical  impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").[24]

Plaintiff also argues that the ALJ should have given controlling weight to Dr. Evans's opinion that plaintiff's ability to work was a "minute possibility." (Tr. 472).  However, as the ALJ stated the "issue of total disability is one that is specifically reserved for the Commissioner." (Tr. 472).  20 C.F.R. § 404.1527(e)(2); Social Security Ruling Titles II and XVI: Medical Source Opinions on Issue Reserved to the Commissioner. Social Security Ruling 96-5p. 1996 WL 374183.


**4. Whether the ALJ improperly rejected the opinion of Fairlie Schreiber, L.C.S.W., the non-examining agency consultants, and the lay witnesses' testimony.**

---

[24]  The regulations also provide that if a treating source is not a treating physician the ALJ should consider the "[l]ength of the treatment relationship and the frequency of examination" and the "[n]ature and extent of the treatment relationship".  Id. at (d)(2)(i) & (ii).

**Fairlie Schreiber, L.C.S.W.**

Plaintiff argues that the opinion of his Social Worker, Fairlie Schreiber, should have been given controlling weight.  On May 5, 1998, Schreiber, initially interviewed plaintiff at the Mental Health Center and continued to participate in many of plaintiff's therapy sessions.  On January 27, 2000, Schreiber opined that with plaintiff's medical problems of diabetes, gout,[25] and chronic back pain and "difficulty handling his emotions and dealing with people, [plaintiff] would be unable to maintain employment." (Tr. 254).  On December 21, 2000, Schreiber, wrote plaintiff's counsel as follows:

> Mr. Gibbs has made a poor adjustment throughout his life. He has lost jobs related to his personality problems and has no contact with his wife or sons.  He lives with his mother.  He is quiet, rigid, and has difficulty handling change. He has problems with his temper.  He tends to ruminate and obsesses about various worries.
>
> Prognosis for change is very poor.  Focus in group therapy is to provide support and to help him evaluation (sic) situations more realistically.  Medication is given to help with his depression.

(Tr. 269).

Even though Schreiber reports that plaintiff has lost his jobs because of his personality disorder, plaintiff worked as a correctional officer for seventeen years. (Tr. 145).  Also, plaintiff reported that he was allowed to resign from this job after an incident involving carrying $50.00 at work which was a prohibited amount.  He also reported that he lost his job as a cook because he did not see the schedule and failed to show up. (Tr. 218).  He also reported that he was fired from his security guard job because he was suspected of sleeping at work but he was actually leaning his head back because of a headache. (Tr. 218).

---

[25]  Plaintiff has not alleged that he has gout.

The ALJ specifically referenced the finding of Dr. Hart, the examining psychiatrist at the Mental Health Center who found plaintiff's

> [f]ocus is on getting disability as his "personality problems prevent him from obtaining and maintaining a job." Patient advised that he is <u>not</u> chronically mentally ill — <u>not</u> severely impaired and needs to consider vocational rehab services.

(Tr. 216, 476). Dr. Hart found plaintiff "needs to be referred to vocational rehab." (Tr. 216, 476).

Also, the ALJ gave controlling weight to the opinion of Dr. Goulden, Dr. McCleary and Dr. Smith, all of whom examined plaintiff on one occasion but are specialists in their field of psychology and psychiatry. The ALJ's duty is to weigh the evidence and the regulations provide that an ALJ may give more weight to opinions rendered within a specialization area. Therefore, the undersigned finds that the ALJ did not commit error by giving controlling weight to the opinions of the psychologists and psychiatrist. 20 C.F.R. § 404.1527(d)(5) (We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.). Even though Schreiber as a social worker for Mobile Mental Health Center is a recognizable source, 20 C.F.R. § 404.1513(d)(3) (we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to--(3) Public and private social welfare agency personnel), the ALJ was still acting within his discretion to give controlling weight to the opinions of Dr. Goulden, Dr. McCleary and Dr. Smith. Also, as previously discussed, the opinions of Dr. McCleary, Dr. Goulden and Dr. Smith are supported by substantial evidence in the record.

**Non-examining agency consultants.**

Plaintiff argues that the ALJ's decision that his residual functional capacity allows plaintiff to

return to his past relevant work as a security guard was contradictory to the determination by the Social Security Disability Examiners Laurin Friday and Carol Davis, and Dr. Crump and Dr. Tucker, the two non-examining agency physicians who reviewed plaintiff's medical records in March and August 1998. (Doc. 11, pages 9, 20-21; Tr. 80-81, 82-83). Plaintiff points out that the Disability Examiners determined plaintiff could not return to his past relevant work. (Tr. 81, 83). Plaintiff argues that their opinions show that the ALJ erred by finding he could return to his past relevant work.

Plaintiff also argues that the ALJ's decision that his severe mental impairments did not result in disabling functional limitations was contradictory to the findings of the non-examining agency psychologists, Dr. Hinton and Dr. Eno, that plaintiff would often experience deficiencies of concentration, persistence or pace. (Doc. 11, page 21).

However, the opinion of a non-examining source, standing alone, generally cannot take precedence over the opinion of a medical doctor, psychologist or psychiatrist who examines the plaintiff and if unsupported can not constitute substantial evidence to support the ALJ's decision. See Swindle v. Sullivan, 914 F.2d 222, 226 n. 3 (11th Cir.1990) (The opinion of a non-examining agency psychologist "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision.")(citation omitted); Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir.1987) ("The opinions of nonexamining, reviewing physicians, ... when contrary to those of examining physicians are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence.").  Accordingly, the undersigned finds that the opinions of the Disability Examiners and non-examining agency physicians are not entitled to controlling weight and the ALJ properly considered their opinions. (Tr. 477).

**Lay witnesses**

Plaintiff also argues that the ALJ should have given more weight to the opinions of lay witnesses who testified on behalf of plaintiff.  On March 14, 2001, six witnesses testified on plaintiff's behalf at the second hearing. (Tr. 40-79).  By testimony, letter or affidavit, the witnesses reported plaintiff's slovenliness; rude and immature behavior including attempts at scatological humor in church and other social settings; inappropriate behavior towards female church members; and his general  surliness and belligerence towards his family and friends.  They also reported physical problems such as hand tremors and actions by the plaintiff which were indicative of back pain.

In regard to their testimony, the ALJ

> acknowledges that several lay witnesses testified at the prior hearing in this matter and
> that many of those witnesses have also submitted affidavits in support of the claimant's
> pursuit of disability. [(Tr. 46-78, 173-179, 180,181-184, 188-190, 194).] The
> undersigned has read and reviewed the testimony and statements of these lay witnesses
> and has given them appropriate consideration in the overall determination in this case.
> The [ALAJ] further notes that Mr. Dirk Young, a friend of the claimant's and the
> claimant's Sunday school teacher, appeared at the September 16, 2003 hearing and
> was prepared to offer testimony that he had ordered the claimant out of Sunday school
> because of disorderly conduct.

(Tr.  470-471).   The ALJ then found as follows:

> With respect to social functioning, the undersigned finds that the claimant has only a
> 'mild' degree of restriction secondary to his mental impairments.  The claimant has
> reported on several occasions that he is very active in his church and that he attends on
> a regular basis.  The [ALJ] acknowledges the statements from the numerous lay
> witnesses regarding claimant's bizarre behavior and sometimes disorderly conduct.
> The [ALJ] does not question the credibility of these witnesses, rather, the undersigned
> questions whether the claimant engaged in bizarre conduct and inappropriate behavior on
> a willful basis.  It seems odd that the claimant was able to respond and behave
> appropriately during his monthly group therapy sessions at the mental health center but
> allegedly could not control himself at church.

(Tr. 478).

The undersigned finds that the ALJ did not err in his consideration of the lay testimony and affidavits.  The ALJ stated that he did not doubt the credibility of the witnesses' testimony and affidavits, but instead he doubted whether plaintiff's actions were not within his control because he acted appropriately during his mental health counseling.  The ALJ has wide latitude as finder of fact to evaluate the weight of the evidence.  Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir.1984), Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996) citing Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam); Grant v. Richardson, 445 F.2d 656 (5th Cir.1971) (per curiam) ("Moreover, the resolution of any conflict in the evidence, . . . and the determination of questions of credibility of the witnesses are not for the court; such functions are solely within the province of the [Commissioner].").


**5. Whether the ALJ improperly rejected the finding of severe impairments entered by the U.S. District Court for the Southern District of Alabama.**

Plaintiff argues that in his previous appeal, the U. S. District Court for the Southern District of Alabama found the evidence supported a finding that he has a severe mental impairment and remanded his case for further proceedings consistent with this finding; however, the ALJ on remand (the case presently before the court) ignored these findings of the District Court.  Plaintiff argues that the ALJ made findings inconsistent with this Court's decision. (Doc. 11, page 17, 21, 26).  The undersigned finds this argument without foundation or merit.  This Court found that plaintiff has a severe mental impairment which was in need of further evaluation of the functional limitations resulting from the severe mental impairment.  This Court did not assess the functional limitations or determine plaintiff's mental

47

residual functional capacity. (Tr. 347-354).  That task was assigned to the ALJ as the finder of fact.

On remand, the ALJ found plaintiff has the severe mental impairments of dysthymic disorder and personality disorder and a residual functional capacity to perform semi-skilled work at all exertional levels and had "only 'mild' limitations in his abilities to maintain activities of daily living, maintain social functioning, and maintain concentration, persistence or pace." (Tr. 476).  Therefore, the present ALJ did not make a finding inconsistent with this Court.  The ALJ performed the necessary evaluation and assessment on remand as this Court instructed and reached a decision regarding plaintiff's mental capacities which is supported by substantial evidence.

**6. Whether the ALJ improperly ignored the U.S. District Court of South Carolina's dismissal of plaintiff's child support enforcement case.**

Plaintiff argues that the ALJ ignored the supplemental evidence from the U.S. District Court for South Carolina wherein the failure to pay child support case against plaintiff was dismissed based upon an affidavit prepared by plaintiff's brother which was provided to Pretrial Services for the U. S. District Court for the Southern District of Alabama and whose investigation found plaintiff was not able to be employed. (Doc. 11, pages 21-22, 24, 28-29, 41).  The records of this court indicate that plaintiff was arrested in July 2002 for non-payment of child support.  In the order setting conditions of release, the undersigned noted that plaintiff should "undergo mental health treatment as deemed appropriate by Pretrial Services". (Criminal Action 02-MJ-0106-L at Doc. 5.)  This court also entered an order wherein plaintiff was provided funds for transportation to the U.S. District Court in South Carolina. (Id. at Doc. 10.)   Plaintiff's only evidence in support of the argument that the South Carolina District

Court dismissed his case because he was disabled is his counsel's letter to the Appeals Council wherein he asks for additional time to provide this record. (Doc. 11, page 21; Tr. 409-410).  Accordingly this argument is without merit.


**VIII.** <u>**Conclusion**</u>

      For the reasons set forth, and upon consideration of the administrative record, the memoranda of the parties, and oral argument, it is recommended that the decision of the Commissioner of Social Security denying plaintiff's claim for Social Security disability insurance benefits and supplemental security income be **AFFIRMED.**

      The attached sheet contains important information regarding objections to this  <u>report and recommendation.</u>

      **DONE** this 17th day of February, 2005.


                              <u>**s / Kristi  D.  Lee**</u>
                              **KRISTI   D.  LEE**
                              **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

s / Kristi  D. Lee
**UNITED STATES MAGISTRATE JUDGE**